# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **DEANE PANTALEO,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 08 C 6419** |
| **v.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **OFFICER LOUIS HAYES, JR.,** | ) | |
| **OFFICER ANTHONY MARAVIGLIA,** | ) | |
| **VILLAGE OF HINSDALE, ROBERT** | ) | |
| **GRONER, SECURITY GUARD** | ) | |
| **SANCHEZ, NURSE PITTS, DR.** | ) | |
| **MARTINEZ, and ADVENTIST** | ) | |
| **HINSDALE HOSPITAL,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

In this section 1983 civil rights suit against Officer Louis Hayes, Jr., Officer Anthony

Maraviglia, the Village of Hinsdale (the "Village"), Security Guard Robert Groner, Security

Guard William Sanchez, Nurse Melissa Pitts, Dr. Carlos Martinez, and Adventist Hinsdale

Hospital (the "Hospital"), plaintiff Deane Pantaleo alleges claims against Hayes, Maraviglia, and

the Village for false arrest and against all defendants for excessive force. Pantaleo also alleges

state law claims for assault and battery and intentional infliction of emotional distress ("IIED")

against all defendants and for malicious prosecution against Hayes, Maraviglia, and the Village.

Pending before the court are defendants' motions for summary judgment.[2] For the following

---

[1] The caption of the complaint identifies the plaintiff as "Dean Pantaleo," but the correct spelling of his first name appears to be "Deane."

[2] Hayes, Maraviglia, and the Village's motion for summary judgment on all claims is Dkt. No. 218. Groner, Sanchez, and the Hospital's motion for summary judgment on Pantaleo's excessive force, assault and battery, and IIED claims is Dkt. No. 221. Pitts and the Hospital's motion for summary judgment on Pantaleo's excessive force and IIED claims is Dkt. No. 224. Martinez's motion for

*(continued...)*

reasons, their motions for summary judgment [#218, 221, 224, 227] are granted in part and denied in part.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

---

(...continued)
summary judgment on Pantaleo's excessive force, assault and battery, and IIED claims is Dkt. No. 227. Defendants have also filed motions to bar Dr. Laurie Zoloth, one of Pantaleo's disclosed rebuttal experts. Those motions (Dkt. Nos. 229, 276, and 280) are addressed separately in a concurrently filed opinion.

# BACKGROUND[3]

## I.     Events Leading Up To November 11, 2007

On October 31, 2007, Pantaleo traveled to Mexico with two friends.  While there, Pantaleo used alcohol and marijuana in excess, leading one of his friends to call Pantaleo's mother expressing concern about his well-being.  Pantaleo's mother and uncle then flew to Mexico to bring Pantaleo back home.  Upon arrival, Pantaleo's mother believed him to be manic. In addition to being agitated, Pantaleo pretended to overdose on Ambien and Seroquel in front of his mother.  Ultimately, Pantaleo agreed to return home to Chicago after his mother lied and told him she was sick from a recent surgery.

Pantaleo, his mother, and his uncle arrived in Chicago on November 10, 2007.  They were met by Pantaleo's father, who drove them straight to the Hospital.  Pantaleo understood that they were going there to have his mother evaluated and treated.  Instead, the visit was intended to get Pantaleo treatment.  Pantaleo's mother told Hospital staff that Pantaleo had tried to kill himself in Mexico, explaining that he had pretended to overdose on Ambien and Seroquel. Pantaleo's mother sought to have him involuntarily admitted to the Hospital.[4]  Pantaleo was

---

[3] The facts in the background section are taken from the parties' Local Rule 56.1 statements of fact and construed in the light most favorable to Pantaleo.  Defendants argue that many of Pantaleo's responses and additional statements of fact are not properly supported by the record.  Statements of fact unsupported by admissible evidence will not be considered.  Additionally, failure to comply with Local Rule 56.1 in responding to a party's statement of facts results in admission of those facts.  *See Smith* v. *Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); *McGuire* v. *United Postal Serv.*, 152 F.3d 673, 675 (7th Cir. 1998) ("An answer that does not deny the allegations in the numbered paragraphs with citations to supporting evidence in the record constitutes an admission.").  In accordance with its regular practice, the court has considered the parties' specific objections and responses and has included in this background section only those portions of the Local Rule 56.1 statements and responses that are appropriately presented, supported, and relevant to the resolution of this motion.

[4] This was not the first time Pantaleo was involuntarily admitted to a hospital for mental health
(continued...)

placed in room 17 of the Hospital's emergency room, a room used for patients with mental health issues or who are displaying signs of agitation. Room 17 has a roll down wall to keep patients from accessing the medical equipment and also has a camera that provides a live feed to the nurses' station. The door to room 17 has an inner part that can be opened out into the hallway.

Pantaleo, not wanting to be admitted to the Hospital, started yelling and attempted to leave. He was stopped, however, by a Hospital security guard. Hinsdale police officers were thereafter called to the Hospital. After speaking with the officers, Pantaleo agreed to take Geodon, a psychotropic medication used to treat manic episodes of bipolar disorder.

## II.    November 11, 2007 Events

Pantaleo woke up on November 11, 2007 in the same room he had been in the night before. Between 6:05 a.m. and 7:05 a.m., Pantaleo spoke with a DuPage County licensed clinical social worker, Michael Gockman. During this interview, Pantaleo made various threatening comments, including these: (1) "My family is affiliated with the mafia, and if you f— with me, your family name goes out of existence;" (2) "If you f— with me, I'll cut off your kid's head and send it to your grandma;" and (3) "I'll kill myself before I go to the hospital; I'll punch out anyone in my way. I'm like the hulk, you can't keep up with crazy." Defs.' Joint Ex. T. Gockman also noted in his report of the meeting that Pantaleo was uncooperative, irritable, anxious, angry, and presented a high danger to himself and others. Gockman concluded that

---

(...continued)
treatment.

Pantaleo required immediate hospitalization for his own safety and that of others. Gockman did not immediately report any of the above to the named defendants or any other Hospital staff.

Since Pantaleo's admission, security guards had been stationed outside room 17. Around 7 a.m., shifts changed, and Groner and Sanchez, Hospital security guards, took up the post outside room 17. They both had been informed that Pantaleo was agitated. Soon after they began their shift, Pantaleo approached Groner and Sanchez and stated he wanted to speak to a nurse or doctor.[5] Groner then spoke with a nurse. Pantaleo followed with yelling out of his room, closing the door, and pushing the gurney up against the door to keep it shut.[6]

Soon thereafter, Pantaleo grabbed an oxygen tank that was stored under the gurney in his room. The parties dispute what happened next. Nurse Pitts,[7] Groner, and Sanchez testified that Pantaleo took the oxygen tank and held it up as if he was going to throw it out the window. They recalled hearing him say something along the lines of "I'm going to throw this f—ing oxygen tank out the window." Defs.' Joint Ex. J 47:13–18; *see also* Defs.' Joint Ex. G

---

[5] Whether Pantaleo used profanity in requesting to speak to a nurse or doctor is disputed by the parties. Pantaleo generally denies swearing that day. At the same time, he admits to having made statements to Gockman that included profanity and testified that he "probably did swear" during the time at issue, *see, e.g.*, Defs.' Joint Ex. B 287:16–18, undercutting his insistence in his response to defendants' statements of fact that he did not swear. Pantaleo cites to Nurse Bielawa's and Maraviglia's testimony to support the fact that he was not swearing. Nurse Bielawa did testify that she did not recall hearing any profanity used by anybody. Maraviglia's testimony, however, was confined to one interaction between Pantaleo and one of the security guards. He testified to other instances during which Pantaleo was swearing at the officers. This dispute is not material to resolution of the motion, however.

[6] Pantaleo emphasizes that he could not barricade himself in the room because the room he was in had a door within a door. There is no dispute, however, that he pushed the gurney up against the door.

[7] Pitts had started her shift around 6:45 a.m. She had not had any contact with Pantaleo on November 10, 2007. She first had her attention drawn to Pantaleo when he was holding up the oxygen tank.

104:1–11, 122:11–14.  Martinez, one of the emergency room physicians on duty that morning,[8] observed Pantaleo raising the oxygen tank on the live feed of Pantaleo's room.  Pantaleo, on the other hand, testified that he held the oxygen tank up because he wanted it removed from the room so it did not pose a hazard if anyone (Hospital staff or police) forced their way into the room.  Groner and Sanchez testified that they told Pantaleo to put the oxygen tank down.  While this was going on, a code gray alert was called, alerting Hospital staff that there was an agitated patient and that extra help was needed in room 17.  Pantaleo testified that after he heard the code gray called, he gave the oxygen tank to Groner because he knew the police were coming and did not want a problem.  Groner instead testified that Pantaleo moved the gurney away from the door, and then Groner opened the door to the room and retrieved the oxygen tank himself.

During the oxygen tank incident, Groner requested that the Hinsdale police be called to assist.  Hayes and Maraviglia, who were on duty at that time, responded to the dispatch call.  Dispatch advised them that there was a patient at the Hospital who was becoming violent and needed to be restrained.  They also were told that officers had been sent to the Hospital the night before to deal with the same patient.  Hayes arrived first, followed by Maraviglia.

Meanwhile, after observing the situation in room 17 from the live feed, Martinez reviewed Pantaleo's chart.  He noted that the chart indicated that Pantaleo was suicidal, was not complying with medication, refused care, had been aggressive with his family and staff the prior evening, and had been administered Geodon.  He concluded that the situation was an emergency

---

[8] Martinez had started his shift around 7:00 a.m.  He had been briefed by the outgoing emergency room physician that there was a psychiatric patient in Room 17 who was involuntarily admitted, suicidal, and in the process of being placed in a psychiatric facility.  Martinez's attention was drawn to the situation in Room 17 with the oxygen tank by Nurse Bielawa, another nurse on duty who is not a named defendant.

and dangerous and thus awaited the police officers' arrival before entering Pantaleo's room to speak with him, as he wanted to use a "show of force" to attempt to get Pantaleo to calm down.

When Hayes and Maraviglia arrived at the Hospital, Pantaleo had calmed down. Hayes and Maraviglia spoke with Groner, Sanchez, Martinez, and Bielawa. Groner testified that he told Hayes that Pantaleo was threatening to throw an oxygen tank out the window and was swearing. Martinez testified that he told Hayes and Maraviglia that Pantaleo had been involuntarily committed based on a suicide attempt, that he was agitated and violent, and that he had barricaded himself in the room. Martinez and Bielawa told Hayes that Pantaleo was being involuntarily committed and so was not free to leave. Hayes also learned that Pantaleo had not been taking his medication. Martinez told Hayes that the medication was legally ordered. Martinez did not give the officers any instructions to restrain Pantaleo. Hayes, however, testified that he "had a discussion with the medical staff that we had already been able to determine that they were going to take action against the patient's will and that the police were there with this lawful basis of authority to take action to use certain powers that are given to the police to help administer the medicine." Defs.' Joint Ex. C 154:9-15. Between themselves, Hayes and Maraviglia discussed their role, including the use of a taser on Pantaleo if necessary. Hayes testified that he was prepared to use physical acts to assist the medical staff. The other named defendants were not aware of the officers' decision to use the taser if necessary.

After discussing the situation with the police officers and security guards, Martinez entered Room 17 and asked Pantaleo to sit on the gurney, which he did. Whether the police officers and security guards entered behind Martinez in a "show of force" is in dispute. Even if they did not enter the room, their presence was known. Martinez testified that he could tell by

speaking to Pantaleo that he was manic and psychotic. Based on Pantaleo's medical condition, history, and behavior, Martinez believed that there was a high likelihood that Pantaleo would require medication. Martinez testified that he told Pantaleo that he had to calm down or otherwise medicine would be administered.[9] Pantaleo, however, continued to insist that he did not want any medicine. Pantaleo testified that he was calm and non-combative while speaking to Martinez and making his wishes known. According to defendants, however, Pantaleo became agitated, upset, and loud and proceeded to yell, scream, and swear. Pantaleo spoke about how he had been tricked into coming to the Hospital and that he wanted to renounce his citizenship and move to Mexico. Pitts testified that she recalled that Pantaleo began doing pushups and yelled "it's on," although Pantaleo denies ever saying that and claims he was doing pushups as part of his normal morning exercise routine. Martinez testified that Pantaleo jumped off the gurney and looked as if he was trying to push through the officers standing at the door to his room.

Martinez then concluded that medication was necessary to prevent harm to Pantaleo and others and ordered Pitts to prepare a Geodon injection.[10] None of the other defendants was involved in making this decision, although they later testified they believed Pantaleo to be a serious threat to himself and those in the emergency room at this point. With the injection ready, Pitts attempted to enter room 17 behind Groner and Sanchez. Pantaleo, however, ran towards the doorway to block their entrance. He tried to close the door, but the officers and security guards pushed it open. Pantaleo then retreated from the door, while Hayes and Maraviglia

[9] Pantaleo admitted that Martinez was speaking in a calm and professional way.

[10] Martinez testified that in emergency situations involving agitated or violent patients, his practice is generally to use Geodon as opposed to placing the patient in restraints because, in his experience, Geodon has a consistent response, is less dangerous to the staff, and is proven to work.

entered the room.  Pantaleo pushed the gurney between him and the officers.  Maraviglia thought Pantaleo was trying to hit him with the gurney, and indeed the gurney struck Maraviglia's left hand.  Hayes then told Pantaleo to get on the ground.  Hayes and Maraviglia testified that Pantaleo did not obey this command and instead took up a fighting stance with his fists closed. Martinez testified that Pantaleo assumed a Heisman-like pose.  Maraviglia testified that Pantaleo was motioning for the officers to come at him, and Groner remembered Pantaleo stating "Bring it on, f—ers."  Defs.' Joint Ex. J 90:8–10.  Pantaleo, however, testified that he assumed a fetal position in the corner of the room.  Hayes then pulled out his taser, testifying that at this point he was afraid Pantaleo would strike him.  Pantaleo testified that once he heard the electronic clicking of the taser, he said "I'll take the medication, just please don't tase me."  Defs.' Joint Ex. B 207:20–23.[11]  Pitts did not recall hearing Pantaleo say anything regarding the use of the taser.  Hayes then used the taser once, discharging the probes into Pantaleo's back for one five-second cycle.  Pantaleo was then handcuffed.  Pitts proceeded to administer the Geodon to Pantaleo, after which the probes and handcuffs were removed.  Pantaleo was moved to the gurney, where Groner and Sanchez secured him in four-point restraints.

## III. Subsequent Events

Throughout the morning of November 11, Martinez continued to monitor Pantaleo's condition.  Pantaleo showed no abnormal signs or problems, and Martinez did not observe any injury or damages resulting from the Geodon injection.  A little over an hour after the altercation, Pantaleo was calm, cooperative, and even apologetic with Martinez.  Subsequently, Pantaleo's

---

[11] Gockman, the social worker, also testified that, from the other side of the emergency room, he heard Pantaleo screaming "you're not going to tase me, you're not going to tase me."  Defs.' Joint Ex. F 88:12–24; 129:19–23.

mental health stabilized, although he suffered a relapse after his father died in a plane crash in 2010. Pantaleo has two red marks on his back from the taser, but he has never sought medical attention as a result of being tased nor has he experienced any negative physical effects as a result.

Although Pantaleo had not been told he was under arrest while at the Hospital, Hayes subsequently authorized criminal complaints against Pantaleo for aggravated assault to a police officer and resisting arrest based on the morning's events. After a trial, Pantaleo was acquitted of these charges.

## IV. Patient Rights

The Illinois Mental Health Code, 405 Ill. Comp. Stat. 5/2-100 *et seq.*, sets forth the rights of patients receiving mental health services. It provides that an adult recipient of services, such as Pantaleo, has the right to refuse medication "unless such services are necessary to prevent the recipient from causing serious and imminent physical harm to the recipient or others and no less restrictive alternative is available." 405 Ill. Comp. Stat. 5/2-107(a). Pantaleo has also submitted an Illinois Department of Human Services form entitled "Rights of Individuals Receiving Mental Health and Developmental Disabilities Services."[12] The form tracks the statute, advising a patient who refuses services, including medication, "[You] will not be given such services except when necessary to prevent you from causing serious harm to yourself or others." Pl.'s Ex. 14 at 2. It also provides that restraints will be used "only to protect you from physically

---

[12] Martinez challenges the exhibit submitted as being without foundation and from a prior visit of Pantaleo's to the Hospital. This is a standard form that is publically available, and Martinez does not argue that it does not accurately reflect the information that would be provided to mental health patients.

harming yourself or others." *Id.* Finally, the form states that the patient may tell the facility the preferred form of intervention, to which the facility must then give consideration. *Id.*[13]

## IV.  Expert Opinions

Dr. Alan Goldberg, Pantaleo's treating psychiatrist since September 2007, opined that Pantaleo was experiencing a psychotic break on November 11, 2007. He also opined to a reasonable degree of medical and psychiatric certainty that Pantaleo did not know right from wrong that day. Dr. Phillip McCullough, a psychiatrist disclosed by defendants, agreed with Dr. Goldberg's diagnosis of Pantaleo's condition on November 11, 2007.

Martinez testified that an emergency existed the morning of November 11, 2007. He testified that the Geodon injection was the least restrictive alternative available given the circumstances. He also stated that it was necessary to place Pantaleo in physical restraints and administer medication to him even after Pantaleo had been tased for the protection of Pantaleo and others. He testified that his experience was that patients would continue their same behavior if they were not medicated when they were in a manic, psychotic, and agitated state.

---

[13] Pantaleo also cites to federal regulations governing participation in Medicare by psychiatric hospitals, 42 C.F.R. § 482 *et seq.*, as setting the standard of care and rights Pantaleo was entitled to. These regulations do not allow for a private right of action. *Neiberger* v. *Hawkins*, 208 F.R.D. 301, 310 (D. Colo. 2002). Neither do they do not set a standard of care. *Id.* Instead, they provide standards with which hospitals must comply in order to participate in Medicare. *See Sepulveda* v. *Stiff*, No. 4:05cv167, 2006 WL 3314530, at *8 (E.D. Va. Nov. 14, 2006) ("Sections 482.1 *et seq.* are merely intended to set out the guidelines for determining whether a hospital may participate in Medicaid or Medicare; indeed, that is its stated purpose."). Defendants also argue that these regulations are not applicable because there is no evidence that Pantaleo was a Medicare beneficiary. Even assuming that these regulations set forth rights that Pantaleo can enforce, they provide for the same "emergency" exception as state law. *See* 42 C.F.R. § 482.13(e) ("Restraint or seclusion may only be imposed to ensure the immediate physical safety of the patient, a staff member, or others and must be discontinued at the earliest possible time."); *id.* § 482.13(e)(2) ("Restraint or seclusion may only be used when less restrictive interventions have been determined to be ineffective to protect the patient[,] a staff member or others from harm.").

Dr. John Ortinau, a board certified emergency medicine physician, reviewed the record and testified that a medical emergency existed on November 11, 2007. He further opined that Martinez's treatment of Pantaleo, including the decision to order the Geodon injection, complied with the appropriate standard of care for emergency medicine physicians. He also testified that no less restrictive alternative was available for the situation.

Pantaleo disclosed two rebuttal experts, Dr. Junig, who is board certified in anesthesiology and practices psychiatry, and Dr. Laurie Zoloth, Ph.D., a bioethicist.[14] Dr. Junig provided coverage for the psychiatric crisis unit during his residency at the Milwaukee County Behavioral Health Center and, upon completion of his residency, worked as a psychiatrist for the Wisconsin Department of Corrections. Dr. Junig opined that less restrictive alternatives to administering Geodon existed under the circumstances, including de-escalation and seclusion.

## ANALYSIS

### I.      False Arrest Claim against Hayes and Maraviglia

Pantaleo alleges that he was falsely arrested by Hayes and Maraviglia. Hayes and Maraviglia argue that Pantaleo cannot prevail on his false arrest claim because they had probable cause to arrest Pantaleo for the crimes charged and also could have charged him with disorderly conduct. To prevail on his claim of false arrest under 42 U.S.C. § 1983, Pantaleo must establish the absence of probable cause for his arrest. *See Kelley* v. *Myler*, 149 F.3d 641, 646 (7th Cir. 1998). Police officers have probable cause to make an arrest when "the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed an offense." *Mustafa* v.

---

[14] Dr. Zoloth's proposed testimony has been barred under Fed. R. Evid. 702. See Dkt No. 291.

*City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006) (citation omitted) (internal quotation marks omitted).  Probable cause is evaluated "not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer* – seeing what he saw, hearing what he heard."  *Mahoney* v. *Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992).  The court's inquiry is limited to the information known to the officers at the time of arrest.  *Mucha* v. *Vill. of Oak Brook*, 650 F.3d 1053, 1057 (7th Cir. 2011).  "[P]robable cause demands even less than probability; it requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false."  *Woods* v. *City of Chi.*, 234 F.3d 979, 996 (7th Cir. 2000) (citations omitted) (internal quotation marks omitted); *see also Maryland* v. *Pringle*, 540 U.S. 366, 370–71, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003) ("The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.").  Determining whether probable cause exists is necessarily a fact-intensive inquiry.  *Jones by Jones* v. *Webb*, 45 F.3d 178, 180 (7th Cir. 1995).  Consequently, summary judgment is inappropriate where material facts regarding the existence of probable cause are in dispute.  *See id.* ("Whether an officer had probable cause to make an arrest generally will present a question for the jury, although the court can decide it when the material facts are not disputed."); *Schertz* v. *Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989) ("While Section 1983 claims presenting the question of probable cause are generally inappropriate for disposition on summary judgment, this is true only where there is room for a difference of opinion.").

Pantaleo was charged with aggravated assault and resisting a peace officer. A person commits aggravated assault when he commits an assault knowing the individual assaulted is a peace officer (1) performing his official duties, (2) assaulted to prevent performance of his official duties, or (3) assaulted in retaliation for performing his official duties. 720 Ill. Comp. Stat. 5/12-2. An assault is committed when, without lawful authority, a person knowingly engages in conduct placing another in reasonable apprehension of receiving a battery. 720 Ill. Comp. Stat. 5/12-1. Resisting a peace officer consists of knowingly resisting or obstructing the performance by a peace officer of any authorized act within his official capacity. 720 Ill. Comp. Stat. 5/31-1. An individual may not commit "a physical act that impedes, hinders, interrupts, prevents, or delays the performance of the officer's duties, such as by going limp or forcefully resisting arrest." *People* v. *Agnew-Downs*, 936 N.E.2d 166, 173, 404 Ill. App. 3d 218, 344 Ill. Dec. 24 (2010).

Hayes and Maraviglia also argue that Pantaleo could also have been arrested for disorderly conduct. Although Pantaleo was not charged with disorderly conduct, "an arrest is reasonable under the Fourth Amendment so long as there is probable cause to believe that *some* criminal offense has been or is being committed, even if it is not the crime with which the officers initially charge the suspect." *Fox* v. *Hayes*, 600 F.3d 819, 837 (7th Cir. 2010); *see also Sroga* v. *Weiglen*, 649 F.3d 604, 608 (7th Cir. 2011) ("The existence of probable cause to arrest a suspect for any offense, even one that was not identified by the officers on the scene or in the charging documents, will defeat a Fourth Amendment false-arrest claim."). To commit disorderly conduct, an individual must knowingly engage in conduct that (1) is unreasonable, (2) alarms or disturbs another, and (3) provokes a breach of the peace. 720 Ill. Comp. Stat. 5/26-

1(a)(1); *People* v. *McLennon*, 957 N.E.2d 1241, 1249, 2011 IL App (2d) 091299, 354 Ill. Dec.

448 (2011). "The breach-of-the-peace element requires nothing more than the unreasonable

harassment of a single person, even in a nonpublic location." *Maniscalco* v. *Simon*, 712 F.3d

1139, 1144 (7th Cir. 2013). Whether an individual has committed disorderly conduct depends

on "the conduct's unreasonableness in relation to the surrounding circumstances." *Biddle* v.

*Martin*, 992 F.2d 673, 677 (7th Cir. 1993).

Here, Hayes and Maraviglia were called to the Hospital upon a report that there was a

patient who was becoming violent and needed to be restrained. Once they arrived, they were

told that Pantaleo was threatening to throw an oxygen tank out the window, had been swearing,

was agitated and violent, and had barricaded himself in his room. Pantaleo disputes that he tried

to throw the oxygen tank out a window, that he was swearing, and that it was possible to

barricade himself in the room. But he does not dispute that this is what the officers were told,

which is the relevant inquiry in determining whether probable cause existed. *See, e.g.*, *Abbott* v.

*Sangamon County, Ill.*, 705 F.3d 706, 716 (7th Cir. 2013) (officer not required to do any

independent investigation after being apprised of situation because "[o]nce a reasonably credible

witness informs an officer that a suspect has committed a crime, the police have probable cause

to arrest the suspect" (alteration in original) (quoting *Mustafa* v. *City of Chicago*, 442 F.3d 544,

548 (7th Cir. 2006))); *Mustafa*, 442 F.3d at 548 ("The existence of probable cause does not

depend on the actual truth of the complaint. The officers were entitled to take Qadeer at his

word as to Mustafa's actions." (citation omitted)).

Although Pantaleo may have been calm when Hayes and Maraviglia first arrived, the

situation thereafter escalated. The facts surrounding what happened after Martinez entered the

room to speak with Pantaleo are disputed, but there is no dispute that Pantaleo closed the door to keep Pitts from entering to administer the Geodon injection and that he thereafter pushed the gurney at the officers as they sought to restrain Pantaleo so that the Hospital staff could do their job. Maraviglia testified that he believed Pantaleo was trying to hit him with the gurney, and the gurney did strike Maraviglia's hand. Taken together, Hayes and Maraviglia had probable cause to believe that Pantaleo had committed aggravated assault and engaged in disorderly conduct. *See Abbott*, 705 F.3d at 715 (probable cause existed to arrest plaintiff for assault where plaintiff had threatened animal control officers with words and an accompanying gesture and officers had considered threats serious enough to warrant calling for police help); *Biddle*, 992 F.2d at 677–78 (probable cause existed to arrest plaintiff for disorderly conduct where he drunkenly had been screaming profanities and making violent arm gestures).

In his response, Pantaleo does not address the elements of the crimes with which he was charged or could have been charged but rather focuses on the fact that charges were only brought against him after he was tased. But Pantaleo does not cite to any case law that probable cause is undermined by a criminal complaint being sworn out only after the events forming the basis of the charges occurred. Pantaleo may be arguing that there could be no probable cause for a charge of resisting a peace officer because he had not been told he was under arrest. Being told that one is under arrest is not a prerequisite to such a charge, however. *See* 720 Ill. Comp. Stat. 5/31-1(a) ("A person who knowingly resists or obstructs the performance of one known to the person to be a peace officer . . . of any authorized act within his official capacity commits a Class A misdemeanor."); *Johnsen* v. *Vill. of Rosemont*, No. 10 C 07097, 2013 WL 3668819, at *3 (N.D. Ill. July 12, 2013) (probable cause existed for resisting a peace officer where actions

interfered with officers' investigation of a domestic dispute). Here, Pantaleo took physical action—attempting to block entrance to his room and pushing the gurney at the officers—to impede the officers' attempts to ensure his safety and the safety of those around him, providing the officers with sufficient probable cause to charge him with resisting a peace officer. But even if a charge of resisting a peace officer required resistance to an arrest and not just resistance to the officer's performance of an authorized act, this alone does not support denying summary judgment here because the officers had probable cause to arrest him for two other offenses, as discussed above.

Pantaleo also argues that his false arrest claim should proceed because Hayes and Maraviglia engaged in a conspiracy to manufacture false charges as a cover-up for the use of the taser on him. The defense replies that there was no claim of conspiracy set out in the First Amended Complaint, nor do allegations exist in the complaint to support such a claim. Because the court is granting summary judgment on the false arrest claim, there is no need to consider whether a conspiracy existed to manufacture false charges. Summary judgment is warranted for Hayes and Maraviglia on Pantaleo's false arrest claim and any recently conceived conspiracy claim.

## II.    Excessive Force

Pantaleo also claims that all defendants are liable for excessive force. Pantaleo's claim encompasses not only the use of the taser but also the subsequent administration of Geodon and application of the four-point restraints. *See* First Am. Compl. ¶ 53 (defendants conspired to "use excessive force against [him], restrain him, and administer sedative medication without his consent and against his clearly stated protestations to the contrary"). Pantaleo alleges that this

violated his Fourth Amendment right to be free from unreasonable search and seizure. *Id.* ¶ 50. But Pantaleo had been involuntarily admitted to the hospital by the time of the events in question, and thus his claim is more appropriately analyzed under the Fourteenth Amendment. While the Fourth Amendment "applies in the civil setting to seizures of individuals for psychiatric evaluations or involuntary confinement," the Fourteenth Amendment "provides involuntarily committed individuals with the right to be free from undue bodily restraint in the course of their treatment by the State." *Lanman* v. *Hinson*, 529 F.3d 673, 680–81 (6th Cir. 2008) ("Even though by bodily restraining a patient State actors are using physical force to restrain the liberty of a citizen, the constitutional right [to be free from undue bodily restraint during treatment] is not governed by the specific provisions of the Fourth Amendment. This is because the act of physically restraining the patient is for the purpose of medical treatment, which the State has determined is a necessary condition of the patient's confinement." (citations omitted)).

Under the Fourteenth Amendment, Pantaleo retained a liberty interest in freedom of movement but that interest was not absolute. *Youngberg* v. *Romeo*, 457 U.S. 307, 319–20, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982). Instead, it had to be balanced against relevant state interests, including the interest in protecting the individual as well as others from violence. *Id.* at 320. Courts analyzing claims under the Fourteenth Amendment have often analogized to Eighth Amendment doctrine. *See Collignon* v. *Milwaukee County*, 163 F.3d 982, 986–87 (7th Cir. 1998) ("[T]here is minimal difference in what the two standards [the Fourteenth Amendment and the Eighth Amendment] require of state actors."). The court in *Youngberg*, however, recognized that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are

designed to punish." *Id.* at 321–22. A decision with respect to the use of restraints, "if made by a professional, is presumptively valid" and "liability may be imposed only when the decision by a professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323.

Despite the applicability of the Fourteenth Amendment, the Fourth Amendment's reasonableness standard informs the court's analysis, particularly in the analysis surrounding the Hayes's deployment of the taser. *Davis* v. *Phillips*, No. 09-CV-3336, 2012 WL 912857, at *6 n.7 (C.D. Ill. Mar. 16, 2012) ("[T]he Fourth Amendment's objective standard may be relevant in excessive force claims under the Fourteenth Amendment." (collecting cases)). Whether defendants' actions were objectively reasonable must be considered in light of the totality of the circumstances. *Phillips* v. *Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). To determine whether the force used was reasonable, the court must engage in a "careful balanc[ing] of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Chelios* v. *Heavener,* 520 F.3d 678, 689 (7th Cir. 2008) (citations omitted) (internal quotation marks omitted). "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the [seizure], the officer uses greater force than was reasonably necessary to effectuate the [seizure]." *Phillips*, 678 F.3d at 519. The court considers the specific circumstances of the seizure, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham* v. *Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

Reasonableness is evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "[S]ummary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus* v. *Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).

## A.    Existence of a Conspiracy

Pantaleo seeks to hold liable for excessive force not only Hayes and Maraviglia, indisputably state actors, but also the remaining individual defendants, who are all private citizens. Pantaleo does not argue that they acted under state law but rather that they conspired with state actors to use excessive force in violation of his constitutional rights. A private party may be held liable under § 1983 "by engaging in joint action with state officials to deprive a person of a federally protected right." *Hughes* v. *Meyer*, 880 F.2d 967, 972 (7th Cir. 1989). "[T]o establish § 1983 liability through a conspiracy theory, 'a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents.'" *Lewis* v. *Mills*, 677 F.3d 324, 333 (7th Cir. 2012) (alteration in original) (quoting *Reynolds* v. *Jamison*, 488 F.3d 756, 764 (7th Cir. 2007)).

Martinez, Pitts, Groner, and Sanchez argue that they did not act under state law by merely calling on the police officers for assistance, citing to *Hughes*, 880 F.2d 967. But *Hughes* recognized that an agreement to deprive an individual of a constitutional right between private and state actors could subject private actors to § 1983 liability. *Id.* at 972. Similarly, *Spencer* v. *Lee*, 864 F.2d 1376 (7th Cir. 1989), is distinguishable, for in that case, there was no allegation

that the private physician had entered into a conspiracy with state actors to administer medication or commit the plaintiff; instead, the issue was whether, by virtue of initiating commitment proceedings, a private physician and private hospital became state actors. Pantaleo acknowledges that the process of involuntary commitment is not itself enough to transform all actions by the non-state actor defendants into state action and instead seeks to proceed only on a conspiracy theory. Here, defendants spoke together before the actions alleged to constitute excessive force occurred. The officers were informed that Pantaleo was not taking his medication. More importantly, Hayes testified that he "had a discussion with the medical staff that we had already been able to determine that they were going to take action against the patient's will and that the police were there with this lawful basis of authority to take action to use certain powers that are given to the police to help administer the medicine." Defs.' Joint Ex. C 154:9–15. Although defendants argue that there is no evidence of a meeting of the minds, Hayes's testimony is sufficient to create a question of fact as to whether defendants joined together with a common goal of administering psychotropic medication to Pantaleo in violation of his constitutional right to refuse such medication. Because a jury must determine whether defendants reached such an agreement, the non-state actor defendants cannot be dismissed on this basis.

### B. Taser Use

Although the parties analyze Pantaleo's complaint regarding the use of the taser under the Fourth Amendment, the court will proceed to consider whether he can establish a claim under either the Fourth or Fourteenth Amendment standards. *Cf. Wilson* v. *Spain*, 209 F.3d 713, 716 (8th Cir. 2000) ("[I]f [the plaintiff] cannot win his case under Fourth Amendment standards,

it is a certainty he cannot win it under the seemingly more burdensome, and clearly no less burdensome, standards that must be met to establish a Fourteenth Amendment substantive due process claim."). Some courts have even suggested that the analysis is the same. *See Davis* v. *Peoria County*, No. 08-CV-1118, 2009 WL 3258318, at *5 (C.D. Ill. Oct. 8, 2009) (analysis of whether officers' conduct constituted excessive force would be the same under the Fourth and Fourteenth Amendments, requiring determination of whether officers' conduct was reasonable under the circumstances).

Pantaleo first argues that the amount of force used was excessive in part because Hayes and Maraviglia knew that they were dealing with a patient of diminished mental capacity. "If the suspect is mentally ill, the officer's awareness of his mental illness is also a factor in the analysis." *Cyrus*, 624 F.3d at 862; *see also Phillips*, 678 F.3d at 526 ("There is a commonsense need to mitigate force when apprehending a non-resisting suspect, particularly when the suspect is known to have diminished capacity. An arrestee may be physically unable to comply with police commands."). This factors as one consideration in determining whether the force was reasonable.

Pantaleo next argues that the force was unreasonable because he was never actively resisting arrest or seizure. The evidence on this point is in dispute. Pantaleo testified that he was calm and retreated to a corner in the fetal position, saying that he would take the medicine so as not to be tased. Under Pantaleo's version, a jury could find that the use of the taser was not objectively reasonable. Defendants, however, testified that Pantaleo was agitated and assumed a fighting position, telling them that "it's on." They testified that Pantaleo pushed the gurney at them, as if he were attempting to impede them from getting to him. They further testified that

the officers ordered Pantaleo to the floor and that he did not comply. According to defendants, Pantaleo never agreed to the injection. These competing versions of events create a genuine dispute as to whether Pantaleo was actively resisting and whether the single use of the taser was appropriate. But this is a dispute not for the court to resolve on summary judgment. *See Cyrus*, 624 F.3d at 862–63 (summary judgment not appropriate where evidence was conflicting on the extent to which the deceased resisted arrest).

If defendants' version of the events is accepted, *Phillips*, which Pantaleo relies on, is distinguishable. In *Phillips*, the plaintiff "never exhibited any sort of aggressive behavior toward the officers before or after they located her car, nor did she make any attempt to escape." 678 F.3d at 524. Under defendants' version, Pantaleo's actions cannot be described as the "passive noncompliance" found in *Phillips*. *Id.* at 525. Further, the type of force used here is different from that in *Phillips*. In *Phillips*, the officers fired multiple rounds of an SL6 baton launcher, which the court observed was "reserved for 'resistive, assaultive, or otherwise dangerous behavior,'" and caused injuries including a six-inch wound that required thirty stitches. *Id.* at 518, 524, 527. Here, on the other hand, Hayes deployed a taser only once, with no subsequent escalation of force. *See Monday* v. *Oullette*, 118 F.3d 1099, 1105 (6th Cir. 1997) (officer's use of pepper spray to get plaintiff onto stretcher and to hospital was not excessive where officer "used only a single burst of pepper spray to get plaintiff on the stretcher, unlike the allegation in [a separate case] that the plaintiff was unnecessarily sprayed a second time after he was subdued"). Further, although both tasers and SL6 baton launchers are considered "less-lethal" weapons, an SL6 baton launcher, unlike a taser, is on the "high end of the spectrum of less-lethal force." *Phillips*, 678 F.3d at 521–22; *see also Abbott*, 705 F.3d at 726 ("[W]e have

also acknowledged that the use of a taser, like the use of pepper spray or pain-compliance techniques, generally does not constitute as much force as so-called impact weapons, such as baton launchers and beanbag projectiles. The use of a taser, therefore, falls somewhere in the middle of the nonlethal-force spectrum." (citations omitted)). Nonetheless, even under defendants' version, whether the degree of force used to address Pantaleo's actions was reasonable remains at issue, particularly considering that Pantaleo was in a confined space with little chance of escaping from two officers and two security guards and was being seized for his own protection and those of others around him, not because he had committed a felony. *Cf. Fitzgerald* v. *Santoro*, 707 F.3d 725, 734–35 (7th Cir. 2013) (where plaintiff was subject to civil seizure for self-protection, use of "minimally forceful techniques designed to subdue non-compliant subjects and prevent escalation" that did not involve "attempt[s] to completely disable her" were objectively reasonable); *Phillips*, 678 F.3d at 525 (noting that plaintiff had "nowhere . . . to go" and thus any threat she presented "had already been substantially contained," and collecting cases where only minimal use of force was appropriate because plaintiff was passively resisting arrest); *Cyrus*, 624 F.3d at 863 (summary judgment inappropriate where court could conclude that use of force was excessive in light of fact that deceased had at most committed misdemeanor, was not exhibiting violent behavior, and officer was aware of deceased's mental illness).

The same result would be reached analyzing the use of the taser under the Fourteenth Amendment. Borrowing from Eighth Amendment jurisprudence, to determine whether the use of force was excessive, the court must consider whether it "was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Lewis* v. *Downey*,

581 F.3d 467, 475 (7th Cir. 2009) (quoting *Hudson* v. *McMillian*, 503 U.S.1, 7, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)). "In many circumstances–often when faced with aggression, disruption, or physical threat–compelling compliance with an order is a valid penological justification for use of a taser." *Id.* at 477. But determining whether force was applied in good faith or to cause harm turns on a variety of factors, similar to those considered under the Fourth Amendment analysis, "including the need for force, the amount of force used, the threat reasonably perceived by the officer, efforts made to temper the severity of the force, and the extent of the injury caused by the force." *Id.* Because the parties dispute the events leading to Hayes's deployment of the taser and the facts must be viewed in the light most favorable to Pantaleo, there is a genuine issue of fact regarding Hayes's mental state. *See id.* at 477–78 (where plaintiff claimed he was lying on his bed in a weak and sluggish state when he was ordered to get up one time without warning that failure to comply would result in taser use, summary judgment was precluded); *Bailey* v. *County of Kittson*, No. Civ. 07-1939 ADM/RLE, 2008 WL 906354, at *22 (D. Minn. Feb. 19, 2008) (whether use of taser on pretrial detainee held in secure room at hospital who was refusing to take oral medicine was reasonable under Fourteenth Amendment analysis was question of fact for jury), *adopted in part and overruled in part*, 2008 WL 906349, at *16 (D. Minn. 2008) (agreeing that an issue of fact remained as to whether use of taser was objectively reasonable). *But see Forrest* v. *Prine*, 620 F.3d 739, 745 (7th Cir. 2010) (use of taser was permissible where plaintiff "posed an immediate threat to safety

and order within the jail").  Thus, under either analysis, defendants are not entitled to summary judgment with respect to Hayes's deployment of the taser.[15]

## C.    Qualified Immunity

Hayes and Maraviglia also argue that they are entitled to qualified immunity for the deployment of the taser because the law regarding the use of a taser to incapacitate a suspect who is mentally ill and resisting was insufficiently clear at the time to put them on notice that the taser use was unlawful.  Hayes and Maraviglia are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Estate of Escobedo* v. *Bender*, 600 F.3d 770, 778 (7th Cir. 2010) (quoting *Sallenger* v. *Oakes*, 473 F.3d 731, 739 (7th Cir. 2007)).  The qualified immunity inquiry has two prongs: (1) whether, taking the facts in the light most favorable to Pantaleo, the officers' conduct violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged violation.  *Saucier* v. *Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).  The court need not consider the two prongs in sequence.  *Pearson* v. *Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

The parties focus their arguments on the second prong, whether the use of the taser in this situation was clearly established on November 11, 2007.  Pantaleo has the burden of establishing that the right was clearly established.  *Escobedo*, 600 F.3d at 779.  Pantaleo "can demonstrate

---

[15] Maraviglia also argues that he cannot be held liable for excessive force because he did not deploy the taser.  As already discussed, Pantaleo has established a question of fact as to whether the parties conspired to deprive Pantaleo of his constitutional rights.  Further, there is evidence that Hayes and Maraviglia agreed to the use of the taser, supporting Pantaleo's allegations that at least these two officers conspired to use excessive force against him.  Thus, the court need not address Pantaleo's newfound contention that Maraviglia failed to intervene.  *See Griffin*, 356 F.3d at 830.

that the right was clearly established by presenting a closely analogous case that establishes that the Defendants' conduct was unconstitutional or by presenting evidence that the Defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Id.* at 780. The court looks to controlling precedent from the Supreme Court and the Seventh Circuit and may look at cases from other circuits in the absence of controlling precedent. *See Pearson*, 555 U.S. at 244 (on qualified immunity defense, defendants may rely on cases from other circuits even though own circuit had not yet addressed the issue); *Escobedo*, 600 F.3d at 782 ("In the absence of controlling precedent from our circuit, courts look to other circuits to ascertain whether there was such a clear trend in the case law that the recognition of the right by a controlling precedent was merely a matter of time."). A case need not be directly on point; "the salient question here is not whether there is a prior case identical to [Pantaleo's] current claim but whether the state of the law at the relevant time gave the Defendants fair warning that their treatment of [Pantaleo] was unconstitutional." *Escobedo*, 600 F.3d at 782.

Hayes and Maraviglia argue that, at the time of the incident, there was a "dearth" of authority regarding the use of a taser to incapacitate a non-compliant individual. Only if defendants' version of events is accepted would this be the case, however. *See Abbott*, 705 F.3d at 727–28 ("Courts generally hold that the use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable." (collecting cases)). But the court takes the disputed facts in the light most favorable to Pantaleo in deciding whether Hayes and Maraviglia are entitled to qualified immunity. *Nanda* v. *Moss*, 412 F.3d 836, 841 (7th Cir. 2005). Viewed in this light, there is a question as to whether Pantaleo was non-

compliant and resisting. The distinction makes a difference to the qualified immunity analysis. *See, e.g.*, *Brooks* v. *City of Aurora, Ill.*, 653 F.3d 478, 486 (7th Cir. 2011) ("Courts often have held that it is reasonable to use pepper spray against a suspect who is physically resisting arrest; conversely, when the use of pepper spray is gratuitous or unprovoked, courts often have considered it excessive." (footnotes omitted)); *Hagans* v. *Franklin County Sheriff's Office*, 695 F.3d 505, 509–10 (6th Cir. 2012) ("A suspect's active resistance also marks the line between reasonable and unreasonable tasing in other circuits." (collecting cases)). "Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects." *Abbott*, 705 F.3d at 732; *see also id.* at 733 ("[S]ince 2007, many of our sister circuits have found the use of a taser against nonviolent, nonresisting misdemeanants to violate clearly established law, the absence of taser case law notwithstanding."); *Shannon* v. *Koehler*, 616 F.3d 855, 864 (8th Cir. 2010) ("Long before September 13, 2006, this court (among others) had announced that the use of force against a suspect who was not threatening and not resisting may be unlawful.").

Hayes and Maraviglia argue, however, that they are entitled to qualified immunity even assuming Pantaleo ceased resisting, relying on *Brooks*. But in *Brooks*, it was undisputed that the plaintiff had backpedaled away from the officer after being informed that he was under arrest, had escaped the officer's attempts to grab him, and had thrown out his arms in what could be construed as a defensive posture. *Brooks*, 653 F.3d at 484. Here, however, there is a dispute regarding whether Pantaleo was resisting, and Pantaleo's disputed actions cannot be "construed to belie" his professed willingness to submit. *See id.* at 486. Because there are conflicting versions of events, "this is one of the unusual cases in which a definitive decision on the

[qualified immunity] issue cannot be had without further factual development." *Abbott*, 705

F.3d at 733–34; *Lewis*, 581 F.3d at 479 (denying qualified immunity where, under plaintiff's

version of events, "no reasonable officer would think that he would be justified in shooting

Lewis with a taser gun").

### D. Administration of Psychotropic Medication

Pantaleo also complains that he was administered psychotropic medication against his

will, in violation of his liberty interest to be free from unwarranted restraints. "Freedom of

bodily movement is a substantive right derived from the due process clause, and it is breached

when [an involuntarily committed individual] is bodily restrained except pursuant to an

appropriate exercise of judgment by a health professional." *Wells* v. *Franzen*, 777 F.2d 1258,

1261 (7th Cir. 1985). "Due process requires that the nature and duration of physical restraint

bear some reasonable relation to the purpose for which it is prescribed." *Wells*, 777 F.2d at

1262. This right also encompasses "a significant liberty interest in avoiding the unwanted

administration of antipsychotic drugs under the Due Process Clause of the Fourteenth

Amendment." *Washington* v. *Harper*, 494 U.S. 210, 221–22, 110 S. Ct. 1028, 108 L. Ed. 2d 178

(1990). In the context of a prison environment, the Due Process Clause permits the State to treat

a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the

inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."

*Id.* at 227. A similar standard applies here. "[L]iability may be imposed only when the decision

by the professional is such a substantial departure from accepted professional judgment, practice

or standards as to demonstrate that the person responsible actually did not base the decision on

such a judgment." *Youngberg*, 457 U.S. at 323; *Estate of Cole by Pardue* v. *Fromm*, 94 F.3d

254, 262 (7th Cir. 1996) ("The right to be free from bodily restraint is breached when an individual is restrained unless the decision was made 'pursuant to an appropriate exercise of judgment by a health professional.'" (quoting *Wells*, 777 F.2d at 1261)). Some courts have alternatively framed the analysis as whether the decision to administer the injection was made "maliciously and sadistically to cause harm." *See Bomprezzi* v. *Kaprivnikar*, No. 11-CV-03344-REB-MEH, 2012 WL 7763089, at *6 (D. Colo. Aug. 3, 2012) (proper inquiry for allegations of excessive force based on mandated injections administered against prisoner's will is "whether the allegations demonstrate the injections were applied maliciously and sadistically to cause harm"); *Yeldon* v. *Sawyer*, No. 9:10-CV-266, 2012 WL 1995839, at *4–5 (N.D.N.Y. Apr. 26, 2012) (same), *report & recommendation adopted*, 2012 WL 1987134 (N.D.N.Y. June 4, 2012).

Here, defendants argue that it is undisputed that a medical emergency existed necessitating the administration of psychotropic medication. Martinez testified to this effect, and his determination is presumptively valid. *See Youngberg*, 457 U.S. at 323. Pantaleo's own testimony that he was calm and compliant is insufficient to create an issue of fact as to the need for the injection.[16] *See Walker* v. *Shansky*, 28 F.3d 666, 672 (7th Cir. 1994) (plaintiff was not qualified to testify as to his medical condition and his self-serving statements regarding his mental health were insufficient to withstand defendants' motion for summary judgment as to

---

[16] Defendants argue that Pantaleo must proffer a medical expert to establish the standard of care applicable to this case. As the court has previously found, Pantaleo need not provide expert medical evidence in his *prima facie* case to establish his excessive force claims. Dkt. No. 179 at 2; *cf. Fleming* v. *Livingston County, Ill.*, 2009 WL 596054, at *2 (C.D. Ill. 2009) (medical malpractice claims under state law and claims under the Fourteenth Amendment for denial of medical care have different liability standards and thus section 2-622 affidavit of medical expert not required for § 1983 claim). *But see Aruanno* v. *Glazman*, 316 F. App'x 194, 195 (3d Cir. 2009) (plaintiff could not survive motion for summary judgment on claim under Eighth Amendment or due process analysis for prescription of antipsychotic drugs "absent expert testimony that would dispute the defendants' assertions that the treatment he received was medically necessary").

whether administration of Haldol constituted excessive force); *Stoltie* v. *Soares*, No. 2:07-CV-1479MCEJFMPC, 2009 WL 1513990, at *11 (E.D. Cal. May 27, 2009) (plaintiff's statement that no emergency existed because he was not exhibiting behavior that entailed a danger to himself or others "was insufficient to rebut the psychiatrist's medical findings that plaintiff was a danger to himself"). But Pantaleo, through his expert Dr. Junig, has also presented evidence that other alternatives should have been explored before administering psychotropic medication. This calls into question Martinez's conclusion that the injection was medically necessary. *Cf.* *Lewis* v. *Carroll*, No. Civ.A. 06-778-GMS, 2011 WL 182844, at *9 n.8, 12 (D. Del. Jan. 20, 2011) (where undisputed medical evidence indicated that plaintiff was danger to himself and others, reasonable jury could not find that force used to help in administration of injection was excessive). Thus, summary judgment will be denied on Pantaleo's claim that defendants violated his rights by administering Geodon against his will.

### E. Use of Restraints

Pantaleo also appears to claim that the use of the four-point restraints was improper and violated his right to be free from restraint. The legal framework is the same as for the administration of the psychotropic medication. Martinez has testified that these restraints were necessary due to the danger Pantaleo posed to himself and to others. The court's analysis must also take into account the fact that "[f]orce is reasonable only when exercised in proportion to the threat posed, and as the threat changes, so too should the degree of force." *Cyrus*, 624 F.3d at 863. Here, at the time the restraints were applied, Pantaleo had already been subdued by the use of the taser and the psychotropic medication. Nonetheless, Pantaleo does not offer any evidence that would call into question Martinez's (and defendants' experts') conclusion that

application of the restraints was necessary.  In fact, his arguments essentially support a finding

that restraints should have been applied in place of administering the psychotropic medication, as

this would have been a less restrictive alternative.  On the facts before the court, then, summary

judgment is warranted on Pantaleo's excessive force claim related to the application of the four-

point restraints.

### III.    *Monell* **Claims against the Village**

The Village may not be held vicariously liable for the actions of its employees.  *See, e.g.*,

*Montano* v. *City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008).  But it may be held liable under

§ 1983 when "execution of a government's policy or custom, whether made by its lawmakers or

by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."

*Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Liability may be based on (1) an express policy that, when enforced, causes a constitutional

deprivation; (2) a widespread practice that, although not authorized by written law or express

municipal policy, is so permanent and well settled as to constitute a custom or usage with the

force of law; or (3) a constitutional injury caused by a person with final policymaking authority.

*Baxter* v. *Vigo County Sch. Corp.*, 26 F.3d 728, 734–35 (7th Cir.1994) (citing *Monell*, 436 U.S.

at 690–91).

Pantaleo seeks to hold the Village liable for false arrest, alleging that the "Hinsdale

Police Department has a custom and practice consistent with the Defendant Officer's [sic]

actions."  First Am. Compl. ¶ 47.  He also alleges that the Village is liable for excessive force, as

the "Hinsdale Police Department maintains a custom and practice consistent with the actions of

Police Officers Hayes and Maraviglia."  *Id.* ¶ 61.  But Pantaleo has provided no support to

establish that the Village maintains any custom or practice to support his false arrest or excessive force claims against it. Because Pantaleo apparently concedes that he cannot establish these claims against the Village by failing to address the Village's argument, summary judgment will be granted in the Village's favor on Pantaleo's § 1983 claims. *See Palmer* v. *Marion County*, 327 F.3d 588, 598 (7th Cir. 2003) (*Monell* claim failed because the "record [was] devoid of evidence showing a pattern, custom, or policy of an unconstitutional nature"); *De* v. *City of Chicago*, 912 F. Supp. 2d 709, 733–34 (N.D. Ill. 2012) (failure to oppose motion for summary judgment with evidence and legal argument constitutes abandonment of claim, collecting cases).

## IV. Tort Immunity from State Law Claims

Hayes and Maraviglia argue that they are entitled to immunity from Pantaleo's state law claims. The Illinois Tort Immunity Act ("ITIA") provides that public employees like Hayes and Maraviglia are not liable for their acts or omissions in the execution or enforcement of any law unless those acts constitute willful and wanton conduct. 745 Ill. Comp. Stat. 10/2-202. Willful and wanton conduct is "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 Ill. Comp. Stat. 10/1-210. In the case of Pantaleo's state law malicious prosecution claim, the ITIA provides immunity to Hayes and Maraviglia unless they acted maliciously and without probable cause. 745 Ill. Comp. Stat. 10/2-208.

As already discussed with respect to Pantaleo's false arrest claim, Hayes and Maraviglia had probable cause to charge Pantaleo with aggravated assault and resisting a peace officer. Thus, the ITIA provides them with immunity from the malicious prosecution claim, 745 Ill. Comp. Stat. 10/2-208, and summary judgment will be entered in their favor on this claim. *See*

*Holland* v. *City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011) (presence of probable cause establishes immunity).[17]

Neither side properly develops an argument as to whether Hayes and Maraviglia's conduct was willful and wanton. Hayes and Maraviglia only argue that "the facts do not constitute any willful or wanton actions." Dkt. No. 220 at 21; *see also* Dkt. No. 259 at 20. Pantaleo, on the other hand, only submits "that the physical actions of Officers Hayes and Maraviglia" demonstrate "an utter indifference to or conscious disregard for the safety of" Pantaleo. Dkt. No. 237 at 17. "[P]erfunctory and undeveloped arguments . . . are waived." *United States* v. *Hook*, 471 F.3d 766, 775 (7th Cir. 2006) (quoting *United States* v. *Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000)). Even if the argument is considered, however, there remain disputed facts preventing the application of the ITIA to the remainder of Pantaleo's state law claims. Whether conduct is willful and wanton is ordinarily a question of fact reserved for the

---

[17] This same result would be reached by examining the substantive elements of the malicious prosecution claim. *See Holland*, 643 F.3d at 255 (noting that Section 2-208 "essentially mirrors and codifies the malicious prosecution standard"). In order to establish this claim, Pantaleo must show "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Id.* at 254 (7th Cir. 2011) (quoting *Swick* v. *Liautaud*, 662 N.E.2d 1238, 1242, 169 Ill. 2d 504, 215 Ill. Dec. 98 (1996)). A finding of probable cause for the crime charged is an absolute bar to a claim for malicious prosecution stemming from that charge. *See Holmes* v. *Vill. of Hoffman Estate*, 511 F.3d 673, 681–82 (7th Cir. 2007). The pertinent time for making the probable cause determination for purposes of a malicious prosecution claim is the time when the charging document is filed as opposed to the time of arrest. *See Holland*, 643 F.3d at 254. Under Illinois law, criminal charges may be commenced via an indictment, information, or criminal complaint. *Logan* v. *Caterpillar*, 246 F.3d 912, 922 (7th Cir. 2001) (citing 725 Ill. Comp. Stat. 5/111–1). Pantaleo cites only to the allegations of his complaint to support his claim, but he cannot rely on these on summary judgment. *See Mosley* v. *City of Chicago*, 614 F.3d 391, 399–400 (7th Cir. 2010) (pointing to allegations in complaint to support claim is "not the proper standard for summary judgment" for "[a]t this stage, [plaintiff] is required to offer support for those allegations"). The court has already explained that probable cause existed for Pantaleo's arrest and Pantaleo fails to cite any evidence tending to show that those circumstances somehow changed between the time of the events in question and the signing of the criminal complaint. Accordingly, Pantaleo's malicious prosecution claim fails on the substantive merits as well.

jury but may be determined as a matter of law "if the evidence so overwhelmingly favors one party that a contrary determination cannot stand."  *Bielema ex rel. Bielema* v. *River Bend Cmty. Sch. Dist. No. 2*, 990 N.E.2d 1287, 1289, 2013 IL App (3d) 120808 (2013) (quoting *Brown* v. *Chicago Park Dist.*, 581 N.E.2d 355, 358, 220 Ill. App. 3d 940, 163 Ill. Dec. 404 (1991)).  Here, the officers were aware that Pantaleo was refusing the medication.  Yet they nonetheless aided in its administration.  Moreover, there is a dispute as to whether their conduct in using the taser was excessive.  Under Pantaleo's version of events, they could be found to have engaged in willful and wanton conduct.  *See Lewis* v. *Tazewell County*, No. 10-1268, 2013 WL 869949, at *7 (C.D. Ill. Mar. 7, 2013) (under plaintiffs' version of facts, jury must determine whether defendant engaged in actions not protected by ITIA).  Thus, the court will proceed to analyze the remaining state law claims on their merits.

## V.        Assault and Battery[18]

Pantaleo alleges that defendants conspired together to restrain him and administer Geodon against his will.  Initially, as discussed in connection with Pantaleo's excessive force claim, there is a question of fact as to whether a conspiracy existed, and thus no defendant will be dismissed solely because he or she did not personally take an action that Pantaleo claims constituted assault or battery.

Under Illinois law, an assault is committed when a person engages in conduct without lawful authority that places another person in reasonable apprehension of receiving a battery. 720 Ill. Comp. Stat. 5/12-1.  A battery occurs when a person intentionally or knowingly without legal justification and by any means causes bodily harm to another or makes physical contact of

---

[18] Pitts does not seek summary judgment on Pantaleo's assault and battery claim.

an insulting or provoking nature with another.  720 Ill. Comp. Stat. 5/12-3.  An officer "will be immune from liability for the claim of assault and battery if it is deemed he used reasonable (and not excessive) force at the time, necessary to prevent public or private injury greater than what may reasonably result from the Police Officer's own conduct towards the arrestee."  *Bruce* v. *Perry*, No. 03-CV-558-DRH, 2006 WL 1777760, at *7 (S.D. Ill. June 23, 2006); 720 Ill. Comp. Stat. 5/7-5; *see also Stewart* v. *Harrah's Illinois Corp.*, No. 98 C 5550, 2000 WL 988193, at *18 (N.D. Ill. July 18, 2000) ("Although Section 7-5 is part of the state criminal code, it has been applied in cases where police officers are faced with civil liability for battery in effecting arrests.").  As discussed in relation to Pantaleo's excessive force claim, a dispute remains as to whether the use of the taser was objectively reasonable, warranting denial of summary judgment with respect to the use of the taser.[19]  *See Brucato* v. *Dahl*, No. 02 C 9401, 2006 WL 644470, at *5 (N.D. Ill. Mar. 10, 2006) ("When a reasonable jury could find that the force used was unreasonable, however, a claim for battery will survive summary judgment.").

Pantaleo also argues that the administration of Geodon without his consent constituted a medical battery.  To recover under the tort of medical battery, Pantaleo must establish "that there was no consent to the medical treatment performed, that the treatment was against [his] will, or that the treatment substantially varied from the consent granted."  *In re Estate of Allen*, 848 N.E.2d 202, 210, 365 Ill. App. 3d 378, 302 Ill. Dec. 202 (2006).  "Under such circumstances, a battery has occurred because the person administering the medical care intentionally touched the person of another without authorization."  *Id.* at 211.  Both common

---

[19] As the officers were not making an arrest at the time, there is also a question of whether the defense provided by section 7-5 even applies here.  The analysis would remain the same, however, if they were acting pursuant to other lawful authority, as the officers argue.

law and statutory exceptions to the need for consent exist.[20]  Defendants seek to take advantage

of the exception provided by section 2-107 of the Mental Health Code.  The court has previously

determined that this is an affirmative defense for which defendants, and not Pantaleo, bear the

burden of proof.  Dkt. No. 179 at 2.  Thus, the fact that Pantaleo has not put forth affirmative

evidence in his *prima facie* case with respect to this defense is of no matter.  *Id.*

"[A] person subject to involuntary admission may refuse medical treatment under section

2-107 while hospitalized unless (1) under the *parens patriae* doctrine he has been adjudicated

incompetent in a separate proceeding or (2) if an emergency situation exists where the individual

poses an *immediate* threat of physical harm to himself or others."  *Matter of Orr*, 531 N.E.2d 64,

73, 176 Ill. App. 3d 498, 125 Ill. Dec. 885 (1988).  If an emergency situation exists,

"psychotropic medications may be forcibly administered as a last resort, only after alternative

treatment plans have been considered" and found unavailable.  *Id.*; *see also* 405 Ill. Comp. Stat.

5/2-107(a) (adult recipient of services has the right to refuse medication "unless such services

are necessary to prevent the recipient from causing serious and imminent physical harm to the

recipient or others and no less restrictive alternative is available").

"The existence of a medical emergency involves the assessment of the patient's medical

condition and, therefore, must be established by expert testimony."  *Allen*, 848 N.E.2d at 212.

Although *Allen* considered the common law emergency exception, the need for expert testimony

---

[20] Pantaleo quotes passages from *Sekerez* v. *Rush University Medical Center*, 954 N.E.2d 383, 394–95, 2011 Il App (1st) 090889, 352 Ill. Dec. 523 (2011), to set forth the elements of a medical battery claim.  Pantaleo emphasizes statements from *Sekerez* that "where a patient expressly refused medical treatment, or the patient's instructions specifically preclude the treatment rendered, treatment contrary to the patient's will constitutes a battery even when an emergency exists."  *Id.* at 395.  But despite this statement, the court in *Sekerez* recognized that the emergency exception could defeat plaintiff's medical battery claim.

to establish an emergency under section 2-107 would be no different.  In *Allen*, the court concluded that plaintiff's failure to present expert medical testimony that contradicted the defendant's testimony that a medical emergency existed meant that defendant's testimony should be taken as true.  *Id.*  As in *Allen*, here, Dr. Martinez testified that a medical emergency existed necessitating the use of Geodon to protect Pantaleo's safety and the safety of others. Defendants' experts agree.  Pantaleo has not proffered any expert medical testimony to dispute Martinez's assessment of an emergency.  Thus, the court must take Martinez's testimony as true in determining whether summary judgment is appropriate.  *See Allen*, 848 N.E.2d at 212 ("Generally, an averment made in an affidavit or deposition in support of a motion for summary judgment that is not controverted by a counteraffidavit or counterdeposition will be taken as true, notwithstanding the opposing party's contrary allegations in his complaint or answer that merely purport to establish *bona fide* issues of fact.").  *But see Threlkeld* v. *White Castle Sys., Inc.*, 201 F. Supp. 2d 834, 845 (N.D. Ill. 2002) (jury could conclude that doctor violated sections 5/2-102 and 2-107(a) of Mental Health Code by ordering administration of Ativan to plaintiff where plaintiff testified she was calm except for when she was being restrained and testified she suffered emotional distress as result of experience at hospital, despite doctor's testimony that Ativan was necessary and that it did her no harm);

But not only must defendants establish that a medical emergency existed, they must also demonstrate that there is no dispute regarding whether less restrictive alternatives were available. Martinez has testified that no less restrictive alternatives were available.  Pitts testified, however, that keeping Pantaleo in the room in restraints would have kept him from harming himself and others.  *See* Defs.' Joint Ex. G 225:7–20.  Moreover, Pantaleo's expert, Dr. Junig, testified that

other less restrictive options, such as de-escalation and seclusion, were available and should have been considered.

Defendants argue that Dr. Junig's opinions are irrelevant as he is not of the same "school of medicine" as Martinez. For an expert physician's testimony to be admissible, two requirements must be met: (1) "the physician must be a licensed member of the school of medicine about which he proposes to express an opinion," and (2) "the expert witness must show that he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community." *Purtill* v. *Hess*, 489 N.E.2d 867, 872–73, 111 Ill. 2d 229, 95 Ill. Dec. 305 (1986). It then lies within the court's discretion to determine whether the witness is qualified to express his opinion on the standard of care. *Id.* Here, both Dr. Junig and Martinez are licensed physicians. Although Dr. Junig is a psychiatrist while Martinez is an emergency room physician, this does not automatically disqualify Dr. Junig from providing expert testimony on the availability of less restrictive alternatives in this case. Contrary to defendants' arguments, "[w]hether the expert is qualified to testify is not dependent on whether he is a member of the same specialty or subspecialty as the defendant but, rather whether the allegations of negligence concern matters within his knowledge and observation." *Jones* v. *O'Young*, 607 N.E.2d 224, 226, 154 Ill. 2d 39, 180 Ill. Dec. 330 (1992); *see also Alm* v. *Loyola Univ. Med. Ctr.*, 866 N.E.2d 1243, 1248, 373 Ill. App. 3d 1, (2007). Defendants do not challenge Dr. Junig's familiarity with psychiatric patients or the various alternatives available when dealing with a patient experiencing a psychotic break. Dr. Junig has not worked in a general hospital emergency department nor does he have hospital privileges at this time, but he testified that the Milwaukee County Behavioral

Health Center, where he performed his residency, "was essentially an emergency room." Defs.'
Joint Ex. 26:14–15. The court finds that Dr. Junig has sufficient familiarity with the standards of
care required in treating patients like Pantaleo and thus may opine on the medical issues here.
Dr. Junig's and Martinez's conflicting testimony regarding the availability of less restrictive
alternatives, in addition to Pitts's testimony that placing Pantaleo in restraints would have kept
him from harming himself and others, creates a genuine issue of fact as to whether section 2-107
protects defendants from liability for medical battery. *Cf. Banks* v. *Mills*, 2013 WL 1438104, at
*8 (N.D. Ill. Apr. 9, 2013) (discussing whether plaintiff's due process rights were violated when
doctor decided to forcibly medicate plaintiff after learning of violent episodes, noting that
deliberate indifference claim could not proceed where plaintiff "has offered no evidence of any
alternative treatment plan that Dr. Ahmed should have pursued, let alone that the chosen course
amounted to deliberate indifference").

Finally, Pantaleo argues in a cursory fashion that the application of the four-point
restraints constitutes a battery. As discussed in connection with his excessive force claim, he has
failed to set forth evidence to create a dispute with respect to whether the use of restraints was
unreasonable or unjustified. Thus, summary judgment will be granted to defendants on
Pantaleo's assault and battery claim with respect to the application of the four-point restraints.

## VI.     IIED

Pantaleo also seeks to hold all individual defendants liable for IIED. Under Illinois law,
to establish a claim for IIED, Pantaleo must demonstrate that "(1) defendants' conduct was
extreme and outrageous; (2) defendants either intended to inflict severe emotional distress or
knew that there was a high probability that its conduct would do so; and (3) defendants' conduct

actually caused severe emotional distress." *Lifton* v. *Bd. of Educ. of City of Chicago*, 416 F.3d 571, 579 (7th Cir. 2005) (quoting *Thomas* v. *Fuerst*, 803 N.E.2d 619, 625, 345 Ill. App. 3d 929, 281 Ill. Dec. 215 (2004)). "'Severe emotional distress' is distress so severe that no reasonable person could be expected to endure it." *Id.* "Distress such as humiliation and worry is not sufficient to give rise to a cause of action in Illinois." *Knowles* v. *United Healthcare Servs. Inc.*, No. 05 C 1613, 2006 WL 1430212, at *10 (N.D. Ill. May 19, 2006). Nor are claims that the conduct left a plaintiff "very upset, very nervous, and very depressed," where the plaintiff did not require medical treatment. *Knysak* v. *Shelter Life Ins. Co.*, 652 N.E.2d 832, 839–40, 273 Ill. App. 3d 360, 210 Ill. Dec. 30 (1995); *see also Adams* v. *Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 942, 292 Ill. App. 3d 30, 225 Ill. Dec. 944 (1997) (denying relief where there was "no evidence to show the severity of the distress [plaintiff] suffered, *i.e.,* that he was hospitalized, sought and received psychiatric treatment, or even was prescribed medication").

Because the court has found a dispute with respect to whether the use of the taser was objectively unreasonable and whether administration of the psychotropic medication was appropriate, there is also a question as to whether this conduct was extreme and outrageous. *See Puch* v. *Village of Glenwood, Ill.*, No. 05 C 1114, 2012 WL 2502688, at *7 (N.D. Ill. June 27, 2012) (denying summary judgment on IIED claim where there were disputed facts regarding excessive force claim). Regardless, Pantaleo sets forth no evidence to support a finding that he suffered severe emotional distress as a result of the use of the taser or administration of the psychotropic medication.[21] Without any support for the assertion of severe emotional distress,

---

[21] Pantaleo does reference recurrent mental health issues in 2010 but admits that these arose in connection with his father's tragic death.

Pantaleo's IIED claim fails. *See Puch* v. *Village of Glenwood, Ill.*, No. 05 C 1114, 2008 WL 4442610, at *9 (N.D. Ill. 2008) (party opposing summary judgment has "an obligation to 'identify with particularity the evidence that precludes summary judgment'" (quoting *Richards*, 55 F.3d at 251)).

## CONCLUSION AND ORDER

For the foregoing reasons, defendants' motions for summary judgment [#218, 221, 224, 227] are granted in part and denied in part. Summary judgment is granted in favor of Hayes, Maraviglia, and the Village on Counts I and III, in favor of the Village on Count II, and in favor of all defendants on Count V. Summary judgment is also granted in favor of all defendants on Counts II and IV with respect to application of the four-point restraints. This case will be called for a status hearing on October 15, 2013 at 8:30 a.m. The parties are directed to engage in a sincere effort to settle this case and to report their progress at the status hearing.

Dated: September 20, 2013              Enter: _____

                                       JOAN HUMPHREY LEFKOW
                                       United States District Judge